E. L. Collamer, Sr. v. Commissioner.
Collamer v. Commissioner
Docket No. 17481.
United States Tax Court
1950 Tax Ct. Memo LEXIS 212; 9 T.C.M. (CCH) 367; T.C.M. (RIA) 50107; April 21, 1950
*212 Held, the petitioner and his wife did not really and truly in good faith and acting with a business purpose intend to join together as partners in the conduct of a moving picture theatre. William L. Parker, Esq., 718 National Bank of Commerce Bldg., Norfolk 10, Va., for the petitioner. George J. LeBlanc, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Facts and Opinion The Commissioner determined deficiencies in income tax of $12,183.78 and $7,628.62 for the years 1943 and 1944, respectively. The deficiencies result from the d ermination of the Commissioner that all of the net earnings derived from the operation of the Park Theatre, Norfolk, Virginia, were taxable to petitioner. Findings of Fact The petitioner and his wife, Ada P. Collamer, reside in Norfolk, Virginia. The returns of petitioner for the years 1943 and 1944 were filed with the collector of internal revenue for the district of Virginia. From 1922 to on or about October 4, 1933, the petitioner was engaged in the electric welding business at Portsmouth, Virginia. On October 4, 1933, he entered into a written contract for the purchase of the "Park Theatre property or lot No. 2 *213 and 3 in Block No. 11 on the plat of Fairmount Park" and "all of the theatre equipment, excepting the Western Electric Sound equipment", all in Norfolk, Virginia, for $13,000, of which amount $1,500 was paid in cash. Petitioner assumed payment of a mortgage on the property and a second was executed for the balance of $2,800. Under the agreement, deeds to the property and possession thereof were to be delivered on October 9, 1933. On October 4, 1933, neither petitioner nor his wife had any money or other property. Title to a residential property located in Portsmouth, Virginia, and occupied by petitioner and his family as a residence, was in petitioner's name. However, this property was actually purchased and owned by petitioner's aunt. At that time petitioner was liable for delinquent taxes on such property. The delinquent taxes were later paid by petitioner with profits derived from the operation of the Park Theatre. Title to the theatre property was taken in the name of petitioner. The cash payment of $1,500 was obtained by petitioner as a loan from his aunt, which loan was not evidenced at that time by a note or any other writing. Petitioner borrowed an additional amount of *214 $2,500 from his aunt, and on June 20, 1934, he and his wife executed a note payable to the order of his aunt in the amount of $4,000 secured by a deed of trust. The additional $2,500 was turned over by petitioner to the former owner of the Park Theatre property to apply on the purchase price thereof. The petitioner made periodic payments on the mortgages on the Park Theatre property out of profits realized from the operation of the theatre. On December 23, 1936, the petitioner and his wife executed and delivered to the Merchants and Mechanics Savings Bank of the City of Norfolk, Virginia, a note for $14,000, secured by a first mortgage on the theatre property and payable at the rate of $200 per month, the first payment to be made on February 1, 1937. The proceeds of this loan were used for the payment of all the then existing loans and mortgages against the Park Theatre property and for certain improvements and alterations to the theatre building. All payments on this loan were made out of the profits realized from the operation of the theatre. The note was paid in full on July 1, 1942. On May 30, 1937, the petitioner and his wife executed a note for $4,200 payable to the order *215 of Merchants and Mechanics Savings Bank of the City of Norfolk. The proceeds of the note were used to purchase an air-conditioning unit for the Park Theatre. This loan was paid from the proceeds of a note dated June 28, 1937, in the amount of $5,600 payable to the same bank executed by petitioner and his wife. The additional amount of $1,400 was used for the payment of the cost of installing the above referred to air-conditioning unit. In May, 1934, petitioner and his family moved to 1607 Lafayette Boulevard, Norfolk, Virginia, which property was located about ten blocks from the Park Theatre. This property was purchased and title thereto was taken in the name of petitioner. The property was paid for from the profits derived from the operation of the Park Theatre. The Park Theatre, which had 336 seats, is situated on the outskirts of Norfolk. It was open to the public from 3:00 P.M. to 11:00 P.M. each day. The programs were changed each Monday, Wednesday, and Friday. The pictures exhibited were not "first run pictures" and were purchased and exhibited when made available by the film companies. The admission prices in 1933 were 10 and 15 cents. When the petitioner began operation *216 of the theatre, and for some time thereafter, the pictures were booked for petitioner by a brother-in-law of the former owner of the Park Theatre, for which services he received compensation from petitioner. Until forced by ill health to quit in 1942, the petitioner devoted his entire time to the management and operation of the theatre. He sometimes arrived at the theatre as early as 9 o'clock in the morning and remained there until shortly after the closing of the theatre. He was assisted in the operation of the theatre by his wife, and his son and daughter, aged 15 years and 18 years in 1933, respectively. In addition, the petitioner employed two ushers, a projection-machine operator and a cleaner or janitor. When petitioner bought the theatre property, his wife told him that she "would go in and help him to try to make a go of it." She usually arrived at the theatre shortly before 3 o'clock in the afternoon and served as cashier in the box-office, which opened at 3:00 P.M. and closed at 9:15 P.M. The daughter served as relief cashier from time to time during the day and also served as cashier for two or three weeks at a time in the absence of her mother. After the box-office *217 closed, petitioner's wife when acting as cashier took the receipts to the theatre office and checked them. She usually remained in the theatre until the petitioner was ready to leave after the closing of the theatre and they returned home together. At times when petitioner was in the upstairs theatre office, his wife sat in the theatre looking at the pictures. If any disturbance occurred she went up to the office to tell petitioner about it. Petitioner's wife called his attention to the need of cleaning and changing drapes and carpeting and to the dullness of the screen. She assisted petitioner in the selection of new drapes and carpeting. At times, her choice of pattern prevailed. If she thought the janitor had not properly cleaned the theatre, she told petitioner so he could talk to the janitor about it. She never bought or booked any pictures. At times, when in the office, she listened to the picture salesmen talking to her husband and son, but as a rule she left the office when such business matters were discussed. She signed the various notes hereinbefore referred to because she was requested to do so. Petitioner's wife received no compensation for her services. So much money *218 as was needed for living expenses was taken from the daily receipts by petitioner or his wife. The balance of the daily receipts was deposited in a bank. The daughter at times kept the books for the business. She also took the receipts of the theatre to the bank. In the early years of the operation of the theatre she received as compensation about $10 a week. The son at first served as usher. In 1933, and for some time subsequent thereto, he attended school and had to go home early to do his lessons. When he was old enough and had learned how to operate the projection-machine, he relieved the employed operator for an hour so that the regular operator could go out for his evening meal. The books of account of the business carried no capital account or drawing account in the name of petitioner's wife. On Thanksgiving Day in 1942, petitioner became ill at the theatre and thereafter was seriously ill. The operation of the business was turned over to the son, who thereafter served as manager and was paid a salary of about $70 or $75 a week. Neither petitioner nor his wife thereafter ever actively participated in the operation of the Park Theatre. Petitioner's wife devoted all her *219 time to her ill husband. The daughter served as cashier until she married in 1945. Thereafter various persons, not related to petitioner, were employed as cashiers. After the son assumed operation of the business, the net receipts were deposited in a joint account in the name of petitioner and his wife. Some real property, other than the residence and theatre properties, was acquired at some undisclosed time, title to which was taken in the name of petitioner's wife. In January, 1943, the petitioner was sufficiently recovered so that he could travel to California. Petitioner and his wife there visited the sister and brother-in-law of petitioner's wife. The brother-in-law was a credit manager. At some time during the visit, the brother-in-law suggested to petitioner, that, since both petitioner and his wife had worked in the operation of the theatre business, they "should be in partnership" and the "returns should be made in partnership." Petitioner wrote to his son about the suggestion and it was decided that when petitioner returned to Norfolk they would have a certain registered public accountant prepare the income tax returns. After petitioner's return to Norfolk, the petitioner *220 and his son first consulted with the accountant. Upon the accountant's advice, a paper styled"Articles of Partnership" was signed by petitioner and his wife, as follows: "THIS AGREEMENT, Made this first day of January, 1944, between E. L. Callamer and Ada Callamer, of the City Norfolk, State of Virginia, WITNESSETH: "The said Parties have agreed, and by these presents do agree, to associate themselves as Partners in the business of operating what is known as moving picture theatre, or other amusements that would be of benefit to the Partnership. Said Partnership shall continue from the date of this agreement until mutually agreed to dissolve. "And it is further agreed, between the said Partners, that the name of the Partnership hereby formed unless otherwise changed by agreement shall be the Park Theatre. "All profits, gains and increase which shall be made in the conduct of the said business shall be equally and proportionately divided between them, share and share alike. And all losses that shall arise from the conduct of the business shall be borne equally between the said Partners. "In Witness Whereof, we have hereunto set our hands, the day and year first above written. *221 " The petitioner and his wife filed separate returns for the years 1943 and 1944. The Commissioner determined that the petitioner was taxable on the net earnings of the Park Theatre. The petitioner did not at any time really and truly in good faith and acting with a business purpose intend to join together with his wife as partner in the operation of the Park Theatre. Opinion VAN FOSSAN, Judge: The question to be determined is whether the petitioner and his wife operated the Park Theatre as a partnership in 1943 and 1944. The petitioner does not rely upon the agreement executed in January, 1944. Counsel for petitioner at the hearing stated that it had no operative or legal effect, was executed only for the purpose of recording under the Fictitious Name Statute and that it may be disregarded. It is contended that from the inception of the enterprise in 1933 until their retirement in 1943, the petitioner and his wife were in fact operating the business as partners, and that, after their retirement, the business was conducted by the son for their joint account. Whether petitioner and his wife were partners from the time of the purchase of the theatre property in October, 1933, *222 to 1944, inclusive, depends upon whether they "in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." ; . From a careful examination of all the evidence it is our conclusion that the petitioner and his wife never thought of a partnership until it was suggested to them by their brother-in-law in California sometime in 1943. It is true that petitioner's wife from the outset rendered services in the operation of the theatre. In our opinion, these services were not rendered as a partner, but as a loyal wife devoted to her husband's welfare and affairs, both personal and business. She testified that when petitioner bought the business, - "* * * I told him that I would go in and help him to try to make a go of it. * * * I just made my whole life and my work with him because I felt like I just wanted to be with him all the time." When he became ill in November, 1942, she remained at his side and devoted all her time to him. Petitioner's wife contributed no capital originating with her. She testified that she signed *223 the notes because requested to do so. She had no property or funds of her own at the time of the purchase of the theatre property and for some time subsequent thereto. Neither did petitioner's wife participate in the control and management of the business, nor perform vital services therein. She served as cashier but so did her daughter. When there was any disturbance in the theatre she called her husband's attention to it so he could take care of it. She did not reprimand the janitor for not properly cleaning the theatre. She called her husband's attention to it so that he could speak to the janitor about it. She never purchased or booked pictures. Although she sometimes listened to the discussions regarding pictures carried on in the theatre office between her husband and son and salesmen, she usually walked out of the office when they were "discussing the business." Not every association of a husband and wife in business creates a partnership. Nor does it always follow that the parties intend such a relationship from the fact that they both sign notes to borrow money for use in the business. There must be an intention on the part of both parties, express or reasonably implicit *224 in their conduct, to form a partnership. Here we are not convinced that the parties so intended. On the contrary, it is our conclusion that the petitioner and his wife did not really and truly intend to join together for the purpose of carrying on the theatre business as partners, and we have so found. , and , cited by the petitioner, are distinguishable upon the facts. Each case must be determined on its own peculiar facts. Decision will be entered for the respondent.